

ISSUED TO ATTORNEY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Cornerstone Church, Inc.<br>P.O. Box 351690<br>Toledo, Ohio 43635-1690,<br><br>Plaintiff,<br><br>-vs-<br><br>Neil Ardman<br>25503 Echo Terrace<br>San Antonio, Texas 78258,<br><br>and<br><br>NIA Broadcasting, Inc.<br>25503 Echo Terrace<br>San Antonio, Texas 78258<br><br>Defendants. | ) | Case No. 3:01CV7344<br><br>Judge David A. Katz<br><br>**COMPLAINT WITH JURY DEMAND ENDORSED HEREON** |

* * *

For its complaint against Neil Ardman, individually, and NIA Broadcasting, Inc. ("NIA") (collectively, "defendants" or "Ardman"), Cornerstone Church, Inc. ("Cornerstone" or "plaintiff") asserts as follows:

## JURISDICTION

1. Cornerstone is an Ohio nonprofit corporation with its principal place of business in Maumee, Ohio.

2. On information and belief, Neil Ardman is an individual now residing in San Antonio, Texas at 25503 Echo Terrace, San Antonio, Texas 78258.

3. On information and belief, NIA Broadcasting, Inc. is a fictitious business name used by Neil Ardman at the same address.

4. This is an action for breach of contract, negligence, breach of fiduciary duty, conversion and fraud, in which Cornerstone seeks damages in excess of $75,000.00.

5. This court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

6. The Northern District of Ohio is a proper venue for this action under 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to the claim for relief occurred within this District.

## RELEVANT FACTS

7. In the spring of 2000, Cornerstone was presented with an opportunity to obtain an FCC license, or construction permit, for an FM broadcast station sited in Wauseon, Ohio.

8. Cornerstone was interested in obtaining the license if and only if it could broadcast its signal effectively into the Toledo market where its church was located.

9. In its initial investigation, Cornerstone investigated the necessary equipment and became interested in an antenna known as the "Ultra Tracker". In inquiring about the Ultra Tracker from its authorized dealer, Cornerstone further inquired as to a potential site

engineer who had familiarity with this antenna. Through this inquiry, Cornerstone ultimately came in contact with Ardman.

10. Over the ensuing weeks, Cornerstone representatives had several telephone conferences with Ardman regarding Cornerstone's desire to obtain the FCC approved license and broadcast in the Toledo market. Ardman informed Cornerstone that he could engineer the site for final FCC approval at a location which would allow effective broadcasting into the Toledo market. Ardman further represented that he could obtain the necessary equipment at retail cost or lower and that he would then also install the equipment, including the antenna and necessary tower, at the site location. All of these conversations occurred by telephone, with Ardman on more than one occasion placing the call to Cornerstone's representatives in Maumee.

11. Based upon these conversations with and representations by Ardman, Cornerstone agreed to retain Ardman. The agreement between the parties involved three components. Ardman promised to do all necessary engineering for the FCC license approval at a location to meet Cornerstone's intended purpose for a flat fee of $6,000.00. Second, Ardman further agreed to obtain the necessary equipment for Cornerstone at retail cost or better with Ardman's sole remuneration for obtaining the equipment coming from any dealer discount obtained from the seller. Third, Ardman promised to complete the construction for the build out of the station and erection of the antenna and tower at a cost of $1,000.00 per day.

12. At the time of the initial agreement, Ardman was located in Wichita, Kansas. Ardman subsequently moved to San Antonio, Texas sometime in the fall of 2000. There is no record of an "NIA Broadcasting, Inc." in the states of Kansas, Texas, or Delaware, nor is NIA Broadcasting registered to do business in Kansas, Texas, Delaware or Ohio. On

information and belief, NIA Broadcasting is a fictitious name rather than a separate corporate entity.

13. In the alternative, if NIA Broadcasting is a separate corporate entity, Neil Ardman has disregarded the corporate form and has exercised his control and dominion over NIA Broadcasting, which control and dominion has been used to commit fraud on Cornerstone and cause injury or unjust loss to Cornerstone such that this Court should disregard its separate corporate existence.

14. In entering into this agreement with Cornerstone, Ardman promised to perform engineering and consulting services in Ohio, obtain goods for an Ohio corporation and deliver them in Ohio, and conduct construction activities in the erection of the actual station components in the Northern District of Ohio.

15. Pursuant to the agreement made between Cornerstone and Ardman, Cornerstone forwarded its payment for the consulting fee of $6,000.00 by check dated 5/26/00, a copy of which is attached as Exhibit A.

16. Subsequent to the initial payment of the consulting fee, Ardman had several contacts with representatives of Cornerstone regarding the consulting work which he was doing for location of the site. Ardman prepared materials which were provided to Cornerstone's FCC attorneys for the completion of the FCC license approval and site location. The work conducted by Ardman for consulting, including the selection of the site, has resulted in the FCC approval of a site which will not meet Cornerstone's desired results of effectively broadcasting its signal in the Toledo market.

17. Cornerstone now faces reapproval or amendments to its license from the FCC to relocate its site to obtain its desired results.

18. Subsequent to the initial retaining of Ardman for the consulting services, Ardman purchased for the Cornerstone project a "6 bay custom design FM antennae" and "custom tuned tower section to increase tower height to 500'" and invoiced Cornerstone for the total amount of $100,500.00 (a copy of this invoice is attached as Exhibit B).

19. Ardman was aware that Cornerstone desired and expected Ardman to purchase the Ultra Tracker FM antennae and did not reveal to Cornerstone or its representatives that the six bay custom design antennae for which it was being billed was not the Ultra Tracker.

20. Furthermore, in forwarding the invoice regarding the purchased antennae, Ardman represented that the price of the antennae was $42,500.00. However, Cornerstone has since learned that the price of the six bay custom design FM antennae that was actually delivered is approximately $11,000.00.

21. At no time did Ardman reveal that he was charging Cornerstone four times the retail price paid by Ardman for the purchase of the antennae or that the antennae was not the antennae desired by Cornerstone.

22. The antennae was ultimately shipped to Toledo, Ohio, but Ardman instructed Cornerstone not to open the box. Cornerstone did not learn that the antennae was not the Ultra Tracker until late December, 2000.

23. The purchased antenna does not meet the intended goals of Cornerstone and was not tuned to the correct frequency, making it essentially worthless to Cornerstone.

24. Cornerstone also paid $55,000.00 for the tower extension referenced in the invoice attached as Exhibit B. Despite repeated requests, however, Ardman has continually refused to notify Cornerstone as to the location of the alleged tower for which it paid $55,000.00.

25. On information and belief, Cornerstone asserts that no tower was ever ultimately purchased or had not been purchased at the time of the invoice dated July 31, 2000.

26. By forwarding the invoice, Ardman also represented that the retail price of the tower was $55,000.00.

27. Cornerstone has since learned that upon the relocation of the appropriate site for its antennae and tower to reach its desired market, that the custom tower extension to 500' will not be necessary and the purchase, if it was made, will not fit the intended and desired goal of Cornerstone.

28. On or about August 4, 2000, Cornerstone was invoiced by Ardman for a "BE 5KW Solid State Transmitter and exciter" for the total price of $42,500.00 (Exhibit C), on which invoice Cornerstone paid $25,000.00 to Ardman.

29. To date, while Cornerstone has repeatedly asked for the location of this 5 kilowatt transmitter, Ardman has neither delivered the piece of equipment nor notified Cornerstone where the equipment is located.

30. On or about August 29, 2000, Ardman invoiced Cornerstone for a 500' stainless steel tower and related equipment for the total price of $68,240.00. The invoice indicated that the payment must be made 100% in advance (Exhibit D). Cornerstone subsequently paid the $68,240.00 for the 500' stainless steel tower.

31. At the time of the invoicing for this tower, Ardman represented to Cornerstone that the 500' tower was being purchased at a savings of "thousands of dollars."

32. In late November, 2000, Ardman represented to Cornerstone that the tower had been shipped and was in storage, but continually refused to provides its specific location.

33. While Cornerstone has paid for the tower, to date it has neither received the tower nor been notified of its exact location, even though it repeatedly requested such information.

34. Cornerstone has subsequently canceled all contracts with Ardman and unsuccessfully requested that Ardman return the payments made by Cornerstone, which total in excess of $199,000.00.

**FIRST CLAIM FOR RELIEF**

35. Cornerstone incorporates paragraphs 1 through 34 as if fully restated herein.

36. Cornerstone and Ardman entered into an oral contract for Ardman's engineering services for the stated price of $6,000.00.

37. Cornerstone and Ardman further entered into a verbal contract for Ardman to procure certain equipment at retail price or lower.

38. Ardman has breached the oral agreement by failing to provide engineering services to meet Cornerstone's desired objective and as promised by Ardman. Ardman has further breached the oral contract by failing to provide equipment for which he has invoiced Cornerstone and for which Cornerstone has paid, and/or by providing equipment Cornerstone cannot use for its intended purpose.

39. Ardman's breach of the oral contract has caused Cornerstone direct damages in the amount of $199,490.00. In addition, Cornerstone has incurred additional damages for hiring engineers for the proper engineering and location of the site which will meet Cornerstone's objectives, for additional interest and other financing charges in conjunction with

its loan agreements due to Ardman's failure to perform, and for increased legal and consulting fees.

40. Cornerstone is entitled to judgment against Ardman for breach of contract for direct, indirect and consequential damages in an amount to be proven at trial in excess of $200,000.00.

**SECOND CLAIM FOR RELIEF**

41. Cornerstone incorporates paragraphs 1 through 40 as if fully restated herein.

42. When Ardman agreed to provide the engineering services required for Cornerstone's site location for its broadcast channel to fulfill Cornerstone's express purpose of effectively broadcasting in the Toledo market, Ardman undertook certain implied duties, including a duty of performing in a workmanlike manner.

43. Cornerstone relied upon Ardman's asserted expertise in retaining Ardman to perform the engineering services.

44. Ardman failed to perform his duties with the requisite standard of care or expertise of a consulting engineer in the industry and/or failed to perform his services as consultant/engineer in a workmanlike manner under the industry standards.

45. Ardman's failure to perform in accordance with these duties entitles Cornerstone to a refund of the consulting fees of $6,000.00 and for all damages proximately caused by Ardman's breach of duty including, but not limited to, excess financing fees, consulting fees and legal fees incurred by Cornerstone.

## THIRD CLAIM FOR RELIEF

46. Cornerstone incorporates paragraphs 1 through 45 as if fully restated herein.

47. Ardman undertook a duty as agent of Cornerstone for procuring the necessary equipment to complete Cornerstone's construction of a broadcast site to meet its intended purposes.

48. As agent for Cornerstone, Ardman owed Cornerstone an undivided duty of loyalty and honesty and to act in the best interests of Cornerstone for matters within the scope of the agency.

49. Ardman breached these fiduciary duties as agent in procuring a 6-bay FM antennae station which does not have the capacities to fulfill the intended purpose of Cornerstone and was contrary to the directions of Cornerstone who specifically sought the purchase of an Ultra Tracker antennae.

50. As agent for Cornerstone, Ardman also has received $193,490.00 for the purchase of equipment, which equipment other than the 6-bay FM antennae, has not been delivered to Cornerstone.

51. Ardman has breached its duties as an agent for Cornerstone in procuring the necessary equipment, causing Cornerstone damages in the amount of the funds expended, $193,490.00, and in causing additional consulting fees, legal fees and financing costs.

## FOURTH CLAIM FOR RELIEF

52. Cornerstone incorporates paragraphs 1 through 51 as if fully restated herein.

53. As agent for Cornerstone, Ardman had invoiced Cornerstone for the purchase of equipment by Ardman on behalf of Cornerstone, which equipment has not been delivered to Cornerstone. By accepting the funds for the invoiced equipment and not delivering the equipment, Ardman has converted the funds of Cornerstone to his own use and benefit.

54. Ardman is liable to Cornerstone for the conversion of its funds in the amount of $193,490.00. The conversion of Cornerstone's funds has further lead to Cornerstone incurring additional financing fees, legal fees and consulting fees, all as a proximate result of Ardman's conversion of the funds.

55. Ardman's actions in invoicing Cornerstone for equipment which was either not purchased and/or not delivered to Cornerstone was done with Ardman's knowledge and intent that the equipment would not be delivered. At all times in invoicing Cornerstone, Ardman did not intend to deliver the invoiced equipment, but to convert Cornerstone's funds. Ardman's conversion of the funds further constitutes a fraudulent conversion for which Ardman is liable for punitive damages.

**FIFTH CLAIM FOR RELIEF**

56. Cornerstone incorporates paragraphs 1 through 55 as if fully restated herein.

57. Ardman represented to Cornerstone that he had the requisite expertise to properly engineer the site to fulfill Cornerstone's purposes.

58. In conjunction with these representations, Ardman also represented to Cornerstone that he could procure the necessary equipment to fulfill Cornerstone's purposes at a cost of "retail" or lower and that his only remuneration would be any dealer discount provided by the vendor.

59. Ardman invoiced Cornerstone for equipment which has not been delivered and, on information and belief, was never even purchased by Ardman. By sending the invoices to Cornerstone for the purchase of the equipment at its stated price, Ardman represented that he was purchasing equipment for the stated price and that this constituted the retail price from the vendor.

60. Ardman's representations as to his engineering services, as well as to the purchase of the equipment, were made falsely or with reckless disregard as to the truth of the representations.

61. Cornerstone justifiably relied upon the representations of Ardman in obtaining Ardman's consulting services and further in paying the invoices.

62. Ardman's misrepresentations have damaged Cornerstone in the amount of $199,490.00 in direct payments to Ardman for services and equipment which Ardman never provided or intended to provide. Cornerstone has been further damaged by Ardman's misrepresentations by incurring additional consulting fees for the proper engineering of the site, additional financing fees for cash flow for its operations, additional legal fees, and will incur additional expenses for the purchase of the appropriate equipment for the site when finally constructed.

63. Ardman's representations to Cornerstone as to the engineering services being provided and the purchase of the equipment indicated on the invoices were made with knowledge of their falsity, with the intent to defraud Cornerstone.

64. The representations by Ardman were willful and wanton and for the purposes of obtaining money from Cornerstone, entitling Cornerstone to punitive damages.

WHEREFORE, plaintiff, Cornerstone Church, Inc., requests that it be granted judgment as follows:

a. On its first claims for breach of contract in the amount of $199,490.00, and for its incidental and consequential damages, including increased consulting fees, legal fees and financing fees as directly resulting from defendants' breach of contract;

b. On its second claim for relief for Ardman's breach of the implied duties of performance in a workmanlike manner and in accordance with the industry standards on the consulting agreement in the amount of $6,000.00, plus all damages proximately caused by Ardman's failure to perform, including increased consulting fees, legal fees and financing fees;

c. On its third claim for relief for breach of fiduciary duty as agent, for damages in the amount of $193,490.00 for payments made on equipment to date, and for its related damages caused by Ardman's breach, including increased consulting fees, legal fees and finance costs;

d. On its fourth claim for relief for conversion, for judgment in the amount of $199,490.00 for the conversion of Cornerstone's personal property and for punitive damages in the amount of $250,000.00;

e. On its fifth claim for relief for fraud, for judgment in the amount of $199,490.00 and for all damages proximately caused by the fraud including, but not limited to, its increased legal fees, consulting fees and financing costs, as well as for punitive damages in the amount of $250,000.00; and

f. For its costs, attorneys' fees and all other relief to which it may be entitled as a matter of law or equity.

Michael G. Sanderson (0008521)
SHUMAKER, LOOP & KENDRICK, LLP
North Courthouse Square
1000 Jackson Street
Toledo, Ohio 43624
Telephone: (419) 241-9000
Fax: (419) 241-6894
E-Mail msanders@slk-law.com

Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Michael G. Sanderson (0008521)
SHUMAKER, LOOP & KENDRICK, LLP
North Courthouse Square
1000 Jackson Street
Toledo, Ohio 43624
Telephone: (419) 241-9000
Fax: (419) 241-6894
E-Mail msanders@slk-law.com

Attorneys for Plaintiff








**CORNERSTONE CHURCH, INCORPORATED**
**GENERAL ACCOUNT**
P.O. BOX 351690
TOLEDO, OHIO 43635-1690
PH # (419) 891-9989

**THE FIFTH THIRD BANK**
**OF NORTHWESTERN OHIO, N.A.**
TOLEDO, OH 43604
56-5/412

18101

05/26/2000

PAY TO THE ORDER OF N I A BRODCASTING INC $ **6,000.00

Six Thousand and 00/100********************************************* DOLLARS

Security features included. Details on back.

N I A BROADCASTING INC

ENGINEERING

MEMO CONSULTING FEE / NEW FM

⑈018101⑈ ⑆041200050⑆ 801⑈73760⑈ ⑈0000600000⑈

EXHIBIT A

# NIA [redacted]

# INVOICE

400 North Crestway
Wichita . KS 67208
316-618-3970

**INVOICE NO:8501**
**DATE: July 31, 2000**

**To:**
WXQQ

**Ship To:**

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| Neal | Ron Baptist | | | | open |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 | 6 bay custom design fm antenna | 42,500.00 | 42,500.00 |
| 1 | Custom tuned tower section to increase height WMTR tower to 500' | 58,000.00 | 58,000.00 |
| | Paid #2529 $50,000.00 REP | | |
| | | SUBTOTAL | 100,500.00 |
| | | deposit | |
| | | TOTAL DUE | 100,500.00 |

THANK YOU FOR YOUR BUSINESS!

EXHIBIT B

# NIA [redacted]

# INVOICE

400 North Crestway
Wichita , KS 67208
316-618-3970

INVOICE NO:8541
DATE: August 4, 2000

To:
WXQQ

Ship To:

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| Neal | Ron Baptist | | | | open |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 | BE 5KW Solid State Transmitter and exciter | 42,500.00 | 42,500.00 |
| | PAID #2530 .00 (*) 25,000 Rel | | |
| | | SUBTOTAL | 42,500.00 |
| | | deposit | |
| | | TOTAL DUE | 42,500.00 |

THANK YOU FOR YOUR BUSINESS!

EXHIBIT C



# NIA

400 North Crestway
Wichita , KS 67208
316-618-3970

INVOICE NO:8541
DATE: August 29, 2000

To:
WXQQ

Ship To:

| SALESPERSON | P.O. NUMBER | DATE SHIPPED | SHIPPED VIA | F.O.B. POINT | TERMS |
|---|---|---|---|---|---|
| Neal | Ron Baptist | | | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 | 500' Stainless Steele tower , 42" face , includes all lighting as required by FAA . Tower to meet all local, state, and federal codes. Does not include installation We can have this on site within two weeks if we get the order moving On this one, we will need 100% payment in advance. | 68,240.00 | 68,240.00 |
| | | SUBTOTAL | 68,240.00 |
| | | deposit | |
| | | TOTAL DUE | 68,240.00 |

THANK YOU FOR YOUR BUSINESS!

EXHIBIT D